Argued and submitted July 29, 2013, affirmed August 6, 2014

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

ALAN GEORGE McCULLOUGH,
*Defendant-Respondent.*

Jackson County Circuit Court
105458MI; A150054

334 P3d 973

Jamie K. Contreras, Assistant Attorney-in-Charge, argued the cause for appellant. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for respondent. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

## SERCOMBE, J.

In this criminal case involving a prosecution for driving under the influence of intoxicants (DUII), defendant moved to suppress evidence obtained after a trooper entered his trailer without a warrant. In response, the state contended that the trooper's entry into defendant's trailer was constitutionally permissible under the "emergency aid" exception to the warrant requirement. The trial court concluded that there was not a "true emergency" under that exception and granted defendant's motion to suppress on that basis. The state appeals the order suppressing evidence. ORS 138.060(1)(c). We conclude that the motion to suppress was correctly granted. Accordingly, we affirm.

The only evidence offered at the hearing was the trooper's testimony; no photos or other evidence was offered. We describe the facts consistently with that evidence and with the trial court's findings to the extent that they are supported by the evidence. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Because we conclude that the trooper's entry into the trailer was not justified under the emergency aid exception, we focus primarily on the facts leading up to that entry.

One evening, Kimball saw a pickup truck belonging to defendant parked the wrong way on Highway 62. Kimball did not see defendant, but he did see blood on and around the truck. Kimball went to defendant's trailer to check on him. He saw blood near the trailer and leading up to the trailer; however, no one answered the door when he knocked. Kimball then called 9-1-1.

Trooper Neville was dispatched to the truck's location. When he arrived, Fire Chief Miller was already at the scene. Neville saw a truck with substantial front-end damage. From the scene, truck, and tire marks, Neville ascertained that the truck had been traveling east but had crossed over the westbound lanes, where it struck a pile of large rocks on the shoulder, "flipped around a little bit," and came to rest facing west. Examining the truck more closely, Neville saw blood "droplets and spattering" in and around the pickup truck. Neville also saw that the passenger side

of the truck was so filled with clothing and paperwork that it appeared that there could have been no one except the driver in the vehicle at the time of the crash. The driver of the truck was no longer on the scene. Neville described his state of mind at that point as follows: "I [knew] that there had been a crash, someone had been hurt, and my job is to make sure that person is okay."

Neville and Miller then drove to defendant's trailer. On a ramp leading to the trailer door, Neville saw drops of blood. Neville knocked on the door and announced that he was a police officer, but received no response. Through a window next to the door, Neville saw "blood spatters" in the trailer entryway, as well as a rag smeared with blood on the floor. Neville believed that the person involved in the crash was in the trailer and decided that he "needed to make sure that the person [who] was in the wreck was okay and to check on their well-being." After knocking several more times to no response, Neville opened the trailer door and went inside. Miller—whom Neville described as "emergency medical personnel"—did not enter at the same time as Neville; he came in "[a] little bit later."

Once inside the trailer, Neville saw defendant under some blankets on the floor. There was dried and fresh blood on defendant's face and a bandage over his nose. Neville asked defendant if he was okay, how he was doing, and how he got there. Defendant responded that he was "fine" or "okay," but that his nose had been hurt. He told Neville, "I don't really want you inside my trailer. I just want to go to sleep."

In the course of conversation with defendant, Neville noticed a strong odor of alcohol coming from the area where defendant was lying and other indications that defendant might be intoxicated. At that point, Neville believed he had probable cause that defendant had been driving while under the influence, and Neville was both investigating a crime and determining whether defendant needed aid. Although it seemed to Neville that defendant was breathing normally, he "still needed to make sure that [he] didn't have any other substantial injuries." Neville knew from his training and experience that people who are involved in crashes do not

always know right away that they have been injured. Both Neville and Miller "questioned [defendant] and checked on his well-being," but ultimately concluded that defendant "wasn't injured to a point that we needed more professionals." Neville questioned defendant about drinking, and defendant admitted that he had had "plenty" to drink before coming home. Neville asked defendant if he would perform some field sobriety tests; defendant declined. Ultimately, Neville placed defendant under arrest for DUII. At Neville's request, defendant was able to stand, turn around, and put his hands behind his back. Neville did not render any medical attention to defendant, call for ambulance transport, or take defendant to the hospital before taking him to a detoxification center.

The state charged defendant with one count of DUII. Defendant moved to suppress all evidence obtained after Neville entered the trailer. As pertinent to our resolution of this appeal, defendant argued that the initial entry into the trailer violated his constitutional rights because it was unjustified by any exception to the warrant requirement. Defendant acknowledged the emergency aid exception to the warrant requirement, but contended, relying on *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993), that, for the exception to apply, there must be a "true emergency," which, according to defendant, meant that an immediate need for assistance to protect life must, in fact, exist—an officer's good faith belief that such assistance is needed is insufficient. In defendant's view, because there was in fact no need for Neville to enter in order to protect defendant's life, there was no "true emergency" and hence Neville's warrantless entry was not justified.[1]

The state argued that Neville reasonably believed that emergency aid was necessary when he entered the

---

[1] We note that, to the extent that defendant argued that, under the emergency aid exception as set out in *Follett*, the circumstances in fact must have required immediate police action, we rejected that proposition in *State v. Martofel*, 151 Or App 249, 252-53, 948 P2d 1253 (1997) (rejecting argument that "true emergency" prong of emergency aid exception is determined "in hindsight"; clarifying that a "true emergency" exists when, "in addition to the officer's subjective belief that an emergency existed, that belief must have been objectively reasonable at the time of the warrantless entry").

trailer because he had seen blood at the crash site and both outside and inside defendant's trailer, but no one was answering the door. At that point, defendant could have been suffering life-threatening injuries, including significant bleeding, and Neville entered the trailer to render aid or to find out what had happened.

In granting defendant's motion to suppress, the trial court found the following facts: (1) At the crash scene, Neville "observed blood spatters on the inside of the driver's side door panel, driver's seat and floorboard." (2) At defendant's trailer, Neville "observed drops of blood on the wood ramp leading to defendant's door and blood drops inside the trailer door and on the floor." The court granted the motion to suppress, reasoning that "[t]he drops of blood at the scene of the accident, as well as at defendant's home, do not rise to the level of a true emergency."

As they did below, on appeal, the parties dispute whether Neville was justified in entering defendant's trailer without a warrant under the emergency aid exception to the warrant requirement. The state contends that the emergency aid exception justified Neville's entry because he reasonably believed that defendant had been in a serious automobile accident and might have sustained serious injury. Defendant contends that the emergency aid exception does not apply here for either of two reasons: (1) the state failed to prove that Neville subjectively believed that defendant needed immediate aid; or (2) even assuming that he had that belief, it would not have been objectively reasonable. As we explain below, we conclude that the record does not include any evidence that could allow a reasonable factfinder to find that Neville had the requisite subjective belief to support the emergency aid exception.

Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Warrantless entries and searches of premises are *per se* unreasonable under Article I, section 9, unless they fall within one of the few established exceptions to the warrant requirement. *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011) (citing *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983)). The state has the burden of proving that circumstances existing at the time of a warrantless entry were sufficient to justify the admission of evidence because of any exception to the warrant requirement. *Id.*

Here, the state asserts that the evidence should have been admitted because Neville's warrantless entry into defendant's trailer was justified by the emergency aid exception to the warrant requirement. That exception applies "when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." *Id.* at 649 (footnotes omitted).

In addressing that issue below, the parties employed the formulation of the emergency aid exception that we set out in *Follett*, 115 Or App at 680. In *Follett*, we concluded that the emergency aid doctrine provides an exception to the warrant requirement when the following conditions are met:

"(1)   The police must have reasonable grounds to believe that there is an emergency and an immediate need for their assistance *for the protection of life.*

"(2)   The emergency must be a true emergency—the officer's good faith belief alone is insufficient.

"(3)   The search must not be primarily motivated by an intent to arrest or to seize evidence.

"(4)   The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

*Id.* (footnote omitted; emphasis added). As set out in *Follett*, and as we regularly applied it, a warrantless entry was justified under the emergency aid exception when, among other things, an officer held a belief that there is an immediate

need for assistance and that belief was objectively reasonable. *See State v. Goodall*, 219 Or App 325, 335, 183 P3d 199 (2008) (analysis under the emergency aid exception required the court to inquire about the officer's subjective belief and determine whether that belief was objectively reasonable); *State v. Pierce*, 226 Or App 336, 342, 203 P3d 343 (2009) (emergency aid exception did not justify warrantless entry where record was "devoid of any evidence that either of the officers * * * had a good faith belief—let alone reasonable grounds to believe—that [circumstances] indicated an immediate need for their assistance" (internal quotation marks omitted)).

However, several weeks before the hearing on defendant's motion to suppress, the Supreme Court decided *Baker*, which announced a somewhat different formulation of the emergency aid exception:

> "[A]n emergency aid exception to the Article I, section 9[,] warrant requirement is justified when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist *persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm.*"

350 Or at 649 (footnotes omitted; emphasis added).

Accordingly, after *Baker*, some aspects of *Follett* remain: for example, the emergency aid exception applies only when an officer has a belief that there is an immediate need to aid or assist a person, and that belief is objectively reasonable. But *Baker* did not adopt the *Follett* formulation wholesale: for example, under *Follett*, an officer had to believe that the person was in danger of dying. *See, e.g., State v. Martin*, 222 Or App 138, 150, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009) (emergency aid exception did not justify warrantless entry where police had no reason to believe that the defendant was in mortal danger). Under *Baker*, however, the required level of suspected harm is less—as pertinent here, the officer must reasonably believe that a person has suffered "serious physical injury or harm." In sum, after *Baker*, to support the emergency aid exception, the state must prove that the officer, at the time of entry,

believed that there was an immediate need to aid or assist a person who has suffered (or is imminently threatened with suffering) serious physical injury or harm.[2]

Here, the record does not include any evidence that could support the conclusion that Neville had that subjective belief. Neville testified that, at the crash scene, he knew that "someone had been hurt and my job is to make sure that person is okay." Then, Neville testified that, when he was outside of defendant's trailer, he believed that the person injured in the crash was in the trailer and that Neville "needed to make sure that the person that was in the wreck was okay and to check on their wellbeing." Thus, although there is evidence that Neville believed that defendant had been hurt, there is no evidence that, before he entered defendant's trailer, Neville believed that his entry was necessary to render immediate aid or assistance to defendant. Neville believed all that was necessary was to "make sure that [defendant] was okay" and "to check on [his] wellbeing." He did not say that he believed that defendant needed immediate aid or assistance, or that he believed that defendant's injuries were serious.

This case resembles *Martin*. In *Martin*, late one night, officers received a 9-1-1 report that the defendant had been involved in a hit-and-run accident and that a witness had followed the defendant, in her car, to her home. When officers arrived at the defendant's home, they found her "somewhat damaged" car parked at a "skewed" angle in her driveway. Officers knocked on the defendant's door and windows, asking the defendant to come to the door. We noted that "[t]he officers had two motives: to check on the welfare of the driver and to question her about her possible involvement in the hit and run." 222 Or App at 140. After several minutes, the defendant, completely unclothed, opened the door. When she saw police, she ran into a back bedroom. The officers decided that leaving "'a naked person who's acting strangely, was just involved in a car wreck[,] *** at midnight, [with] an open door'" would be irresponsible, and so they entered. *Id.* at 141 (bracketed material in *Martin*).

---

[2] That belief must also be objectively reasonable; however, as explained below, we do not reach that part of the analysis in this case.

The defendant was ultimately arrested and charged with DUII; she later moved to suppress the evidence obtained as a result of the warrantless entry into her home. As pertinent here, the trial court concluded that the warrantless entry was not justified under the emergency aid exception. *Id.*

We observed that a warrantless entry is justified under the emergency aid exception when "the police officer *** subjectively believe[s] that his or her assistance is necessary to protect someone's life and that belief, evaluated at the time of entry and not in light of subsequently discovered facts, [is] reasonable." *Id.* at 148 (citing *State v. Martofel*, 151 Or App 249, 252, 948 P2d 1253 (1997)). We concluded that the trial court's ruling that there was no true emergency was correct for at least two reasons. First, we examined the officers' testimony and concluded that there was no evidence that either of the officers "believed that entry was necessary to protect defendant's life." *Id.* The first officer described what he had observed and questioned, "Can you leave under those circumstances?" *Id.* (internal quotation marks omitted). The second officer testified that he wanted to "make sure [defendant] was OK"; that he was "worried about her well being"; and that he went inside to "check on her to make sure she was okay." *Id.* at 148-49 (internal quotation marks omitted). We concluded that, "[w]hile this testimony might reveal well-founded speculation that perhaps all was not well with defendant, it falls far short of revealing a belief that immediate intervention was necessary to protect her life." *Id.* at 149.

Similarly here, on repeated questioning, Neville testified consistently that his intention was to make sure that defendant was okay and to check on his well-being. As in *Martin*, that may reveal well-founded speculation that perhaps not all was well with defendant, but it falls short of evincing that Neville believed that his intervention was necessary to protect defendant from the effects of serious physical injury or harm.[3]

---

[3] Although we assess whether Neville had the requisite belief as of the time he entered defendant's trailer, *see Martofel*, 151 Or App at 252-53, we observe that Neville's post-entry conduct and his testimony about his post-entry state of mind are consistent with his testimony about his pre-entry state of mind. Upon entering defendant's trailer, Neville did not immediately try to examine

In light of our conclusion, we do not address whether—had Neville testified that he believed his intervention was necessary to render aid to someone who had suffered serious physical injury or harm—that belief would have been reasonable.

Neville's warrantless entry would have been justified under the emergency aid exception only if he believed that his entry was necessary to render aid to someone who had suffered serious physical injury or harm. There is no evidence in the record that would support a conclusion that he held that belief. There is no dispute that the evidence that defendant sought to suppress was the unattenuated product of that unconstitutional police action. Accordingly, the evidence obtained after Neville entered the trailer must be suppressed. *See State v. Hall*, 339 Or 7, 34-35, 115 P3d 908 (2005) (when evidence is obtained as a result of unconstitutional police conduct and no circumstances mitigate the effect of the unconstitutional conduct, subsequently discovered evidence is inadmissible).

Affirmed.

---

defendant, nor did he immediately call Fire Chief Miller—the onsite emergency medical personnel—to examine or render aid to defendant. And Neville continued to describe his state of mind after he entered defendant's trailer as "checking on" defendant and determining whether he needed aid.